At this time, we'll hear United States v. Mitro. Good morning. Good morning, Your Honors. May it please the Court. My name is Chetan Patil, and I represent Defendant Michael Mitro in this appeal. The United States Supreme Court's recent decision in McDonald makes clear that a party can receive extremely extravagant and lavish gifts from a third party by virtue of his position without it constituting honest services fraud. There is no doubt here that the payments that Mitro received were extravagant. But despite any unseemliness with respect to the payments, there is no evidence that Mitro took these payments pursuant to a quid pro quo arrangement. Didn't he perform an official act, which is the McDonough test, after receiving these payments or around the time or before? There's no evidence that he performed any official act. Didn't he make sure that access got paid? Creative. Creative press. Yes. Yes. Didn't he make sure, even though it wasn't his primary duty, didn't he go down and make sure they got paid? So the evidence wasn't clear on that. So I think, Your Honor, you're referring to the fact that there was some testimony that Mitro spoke with members of the finance department on a couple of occasions. That's correct. But this was not favorable treatment. These invoices were not something that were — these were due and owing bills. These were — access had no formal process for paying its vendors. And what it would do was to string along its vendors many months after their bills were due. And in — what prompted their payment was either access's own clients requiring the services that these vendors needed, or, in the alternative, when the clamor from the vendors became too loud. So in these instances, there were times where Madison contacted people at the finance department for bills that were many months overdue, didn't get any response, and then contacted Mitro. This was something that at least one other vendor of access's, another printer, testified happened with them as well. If you're referring to a clamor of vendors, it means that access is not paying its bills as they come due. And therefore, it would be very sensible for one of those vendors to do an expensive favor for somebody who's in a position to put the payment of a creative's bill ahead of the payment of other people's bills. Your Honor, there's no — the evidence showed and the record showed that Mitro wasn't aware of this arrangement. This was testimony as to a couple of occasions. This was not a recurring practice by which he contacted — But what do you suppose was in his mind when he asked the head of creative to draw checks in the six figures or to send them to his mistress? I mean, did he think he was just — that that was the equivalent of a Christmas turkey? The evidence showed that Mitro — we have to look at this in context of access's own business and Mitro's experience with access's business. Access was a company that paid its own clients very lavish gifts. And these were not, you know, tickets to a baseball game either. These were lavish gifts themselves. They were Rolex watches and payments for home renovations and, you know, high-end vacations for the client's families. So from Mitro's perspective, who wasn't a lawyer and who saw these clients accept payments over many years without any indication that they were doing anything wrong, and in fact payments that his employer, Monitor Clipper, when they came along signed off on, Mitro had no reason to believe that there was anything untoward with these. Isn't that an issue of intent? And intent is not something we're really in a position to decide. It's been decided. Your Honor, the district court did decide that, but we submit that the district court got that wrong, that the facts weren't there to infer Mitro's intent in accepting the payments. Rather, the evidence showed that he saw the payments as merely client expenses and client entertainment, obviously of a lavish sort, but expenses that didn't come along with any expectation that he was supposed to do anything with it. And I think it's important to look at this in the history of the Access-Creative Press relationship. As we indicated in our brief, Joe Uzzolino, who was an employee at Access and controlled the labor marketing campaigns at Access, was the one who hand-selected Creative Press. At some point he left and switched into a role as a consultant for Creative Press, but there he played the exact same role and protected Creative Press's business in the same role. The evidence showed that the payments were first offered by Madison in early 2006, that they were taken in late 2006, that they continued during the time that Uzzolino departed Access. So any sense that what Madison was doing was paying Mitro because he was concerned about the business is undermined by that time frame. Madison started the payments when Uzzolino was there to protect him. Counsel, can I switch topics for a moment? Yes, Your Honor. Isn't this case decided by the standard of review? This judge held a five-day Fatico hearing. He made findings of fact, and we give great deference to his findings of fact after hearing testimony. So you have to tell me where he was wrong. Your Honor, one thing I'll note is the district court did hear testimony, but what it inferred, it didn't make any credibility determinations that were relevant to the— It was clear from reading his opinion that he didn't believe Mr. Mitro. There were several findings with respect to specific pieces of testimony that, you're correct, Your Honor,  that doesn't concern any of the issues on this appeal. Here, what the district court got wrong was it conflated, with respect to Madison's intent in making the payments, it conflated a vague hope of a future benefit with a proof of an expectation that the payments would lead to favorable treatment. With respect to Mitro's knowledge of Madison's intent, the district court got it wrong by concluding that Mitro was aware of this waystation theory, that he knew that he was using creative press as a means to funnel access money back to himself. But the evidence didn't show that. The evidence, in fact, showed that Mitro didn't know anything about how creative press funded its business or what its profit margins were. Although we know that when they pulled their business, creative went under, right? So we knew that it was reliant on this account heavily. That only occurred after the payments from Madison had seized. That occurred at some point in 2009. And the payments, the last payment at issue in this case, ended in January 2009. Thank you. Thank you. You've reserved rebuttal. Yes. We'll hear you then, Mr. Patil. Good morning. Good morning. May it please the Court. My name is Alex Robbins, appearing on behalf of the United States. One issue I'd like to clear up at the outset, Your Honor. I believe I heard my colleague in response to Judge Pooler's question about the official act decision in the McDonnell opinion say that there was no official act in this case. And that's the first time that I've heard that argument from the defense at all in this briefing. In our brief on page 27, footnote 15, we flagged the McDonnell issue for this Court and stated that there doesn't appear to be any dispute that MITRA's use of this position to send future business to creative press would be an official act under the case law, however McDonnell comes out. And then we followed up with our 2018 letter when McDonnell did come out. But there is no express quid pro quo. Yes. The issue in this case, Your Honor, my understanding was, was the quid pro quo requirement. The defense until a few minutes ago has never made any argument that sending a vendor millions of dollars in business would not constitute an official act under the McDonnell decision or under the case law. Sundin has a background in the McDonnell decision. That's the strong end of your argument. I understand. The other part is where's the, what do you have to show in terms of an undertaking, explicit or otherwise? The district court found an implicit undertaking and I think fundamentally our argument is not that any payments are sufficient to satisfy the quid pro quo requirement. As Your Honor pointed out, it's a question of intent. Our argument is that in this case, these payments, given the size of the payments, the timing of the payments and the nature of the payments are extremely strong circumstantial evidence that there was an implicit quid pro quo. So the size of the payments, we're talking about one and a half million dollars, almost four times Metro's annual salary over the course of a year. Where would this money go if the government prevails here? Does it go to access or does it go into the treasury? It goes to access, Your Honor. But didn't he settle with access? He settled different fraud with access. He settled the credit card fraud and the Rusnak fraudulent invoice scheme. That was where the, after the money from Creative Press dried up, Metro had his jet company send false invoices to creative, to access, which were then paid. He settled those allegations with access. The restitution order here that Judge Engelmeyer entered would require repayment to access because of access's loss of Metro's honest services. And that's also consistent with the plea agreement where Metro, in his plea agreement, agreed to pay restitution to the extent any was found by the district court for count two, for the honest services count. Has access taken a position on this case? I'm sorry? Has access taken a position on this case? No, Your Honor. I don't believe access is a party to this case. But the restitution would go to access. That's the issue before this court. The size of the payments, $1.5 million. The timing of the payments, I think, is significant, too. The payments from Creative Press to Metro were occurring while there was an ongoing regular business relationship between access and Creative Press. So during 2008, the record shows at page 453 of the appendix, government's exhibit 28-3, there were 28 payments. I'm sorry. There were 21 payments totaling $2.8 million going from access to Creative Press. So it's an average of about $130,000 every two weeks. While this was happening, there were payments, $1.5 million in payments, going back from Creative Press to Michael Metro. And not even for future jet travel or for a future vacation, but for jet travel he had already taken to pay off his million-dollar jet bill, to pay $400,000 to his holding company, to pay $100,000 to his girlfriend's husband's LLC. These are not gifts. These are not Christmas turkeys. The gift in this case, there was a gift in this case by way of counterexample. Julie Glover, the project manager for access who dealt sort of with Creative Press on the union mailing campaigns, when her child was born, she testified that she received a $200 Nordstrom's gift card from Robert Madison. That, we submit, under the circumstances of this case, is a gift. $1.5 million to your girlfriend's husband's LLC and to pay off your jet bill is not a gift any more than it would be a gift if a high-ranking public official were caught in his office at midnight with someone giving him a million dollars in cash. The payment itself is very strong circumstantial evidence of the underlying arrangement or deal or intent between the parties. Counsel, are you aware of any case where the official act theory of the McDonough case has been imported into a civil case or with a non-government defendant or non-government victim? Because official act is sort of a funny term in private business. Not since McDonough was decided, although that was fairly recent. I believe this court has, and I'm struggling for the name, I think Ghanem was a mayor. Rubicki, the en banc decision, may have been a... But you're relying on the official act theory of McDonough, right? Yes, because the Supreme Court has said that it's the, and this court has said, I think we quote Ghanem in our brief for this proposition, that the theory of honor services fraud from pre-McNally to post-McNally to today has been applied by all the courts of appeals to private entities as well as government entities. And so it's the same test whether you're dealing with a private employer or a public employer. It's not a big change in the law you're arguing. No. As far as I'm aware, there are no legal issues in this appeal. The issue is one purely of fact, which is did the district court clearly err in finding, as a matter of fact, that Mitro accepted this $1.5 million believing that he was supposed to do something, that there was a quid pro quo. And that's a question of intent. It's a question of fact. The district court had before it two, arguably, two plausible interpretations. The first most plausible one was that the $1.5 million was, as the district court found, in exchange for future business or, at the very least, for not taking away that future business that would otherwise come. The other possibility. Is this pattern that you're citing of large payments, is that indicative of an implicit quid pro quo or is it evidence of an express one? It's evidence of a quid pro quo. The way it's proved is at least. In other words, the government proved an implicit quid pro quo. It could be that there was an explicit arrangement that we don't have evidence of. The evidence, at the very least, proved an implicit agreement. So it's not to say that there was an explicit agreement. We just don't have evidence of it. What we have is, again, back to the Ghanim decision and the winks and nods from Justice Kennedy's concurrence in Evans, that no type of conspiracy requires an explicit agreement. Conspiracies are often proved by circumstantial evidence. And in this case, we have extremely strong circumstantial evidence. Nor are we even in a context where you're looking at a jury verdict, where a jury had to find beyond a reasonable doubt that there was an implicit quid pro quo. The question here is simply, for the district court, which of the two explanations, these payments, $1.5 million, were in exchange for something or were in exchange for nothing, which of those two explanations is more plausible? The district court chose the more plausible one and certainly committed no clear error. Thank you, Your Honor. Your rebuttal. Your Honor, just to clarify a point, and I apologize if I suggested that we were disputing and that an official act was satisfied. That is not our point. Our point is that there was no agreement or any expectation of a quid pro quo. There was no understanding between Madison and Mitro that there was some plan by which Mitro would change the way he did his job. So that the government is correct that we are not disputing the official act element here. It also bears emphasizing, my colleague brought up this timing of payments by which access. You're saying that there was no official act. We are saying that there was no arrangement here, no quid pro quo, no understanding between them that Mitro was expected to do something, that he was expected to take an official act in exchange for the payments. Except circumstantially, which you just said. There was circumstantial evidence. The timing of the payments, that they were all personal, that they were lavish. These, Your Honor, in an appropriate case, those could be elements from which a court could infer the existence of a quid pro quo, but not based on this record. Here, the record showed that this is not a case involving threats or promises or any communications regarding, indicating that Madison conveyed some concerns about the business. Here, Mitro was not the guy who was involved in selecting access's vendors. Again, the history of the payments is significant here because they began at a time when Madison was aware he was going to get all of the business, all of the labor union business from access. So, on the basis of this record, the circumstantial evidence that Judge Engelmeyer cited is insufficient and it's inconsistent with any inference of a quid pro quo here. And again, I want to stress that, again, my colleague referenced that this history of payments between access and creative press, and creative press receiving a lot of payments from access. But it's important to note that Mitro was not aware of that. He was not generally involved in this relationship, and so he had no insight into how much money creative press was being paid by access. And in fact, as I mentioned, wasn't the guy who selected access as their vendor. Thank you. Thank you both. Thank you. We'll reserve decision.